19-MJ-5356-JGD

# AFFIDAVIT OF FBI SPECIAL AGENT WILLIAM R. McDERMOTT

I, Special Agent William R. McDermott, being sworn, state as follows:

## INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since 2003. For much of that time, I have been engaged in gang and drug investigations. I am currently assigned to the FBI, Boston Office. In this role I work with numerous agents and law enforcement officers in investigating drug distribution and trafficking throughout the United States. In particular, I have been assigned to investigate the drug distribution activities of David WOOD who has been distributing fentanyl and crack cocaine in and around the Boston, Massachusetts area.

2. In the course of participating in investigations of drug trafficking, I have conducted or participated in surveillance; the purchase of illegal drugs; the execution of search warrants; debriefings of subjects, witnesses, and informants; wiretaps; and reviews of consensually recorded conversations and meetings. Through my training, education, and experience, I have become familiar with the manner in which drug traffickers conduct their illegal drug trafficking activity, which includes the use of cellular telephones to communicate with customers, associates, and sources of drug supply.

3. Based on my training and experience, I know that it is a violation of Title 21, U.S.C. § 841(a)(1), for any person to knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance. I am also aware that fentanyl and crack cocaine are listed as Schedule II controlled substances, under the drug scheduling guidelines.

4. I make this affidavit in support of a criminal complaint charging David A. Wood (DOB xx-xx-1989) with illegally possessing and distributing Schedule II controlled substances in violation of 21 U.S.C. § 841(a)(1) on three occasions.

5. The statements contained in this affidavit are based on my own work in this investigation, my training and experience, and information provided by other agents, police officers, and witnesses. This affidavit is submitted for the limited purpose of establishing probable cause to believe that WOOD violated 21 U.S.C. § 841(a)(1). It therefore does not set forth all of the information that I and other law enforcement personnel have obtained during the course of the investigation.

## USE AND RELIABILITY OF A COOPERATING WITNESS; IDENTIFICATION OF DAVID WOOD AS A DRUG DEALER

6. Since November 2019, members of the FBI and the Boston Police Department ("BPD") have been investigating drug trafficking by WOOD in the Boston area of MA.

7. Over the course of the investigation, Special Agents of the FBI and Detectives of the BPD have received information concerning the illegal drug trafficking of WOOD from a Cooperating Witness ("CW-1").

8. CW-1 has provided information about WOOD[1] to include his methods of distribution, telephone numbers used to facilitate distribution, and locations used to facilitate drug trafficking activity.

9. CW-1 began cooperating with law enforcement in January 2018. CW-1 has positively identified numerous individuals involved in drug trafficking, illegal firearm possession, and gang activity. CW-1 has conducted numerous consensually recorded conversations in person

---

[1] WOOD is known to CW-1 as "Ditteo," as described more fully below. For purposes of this Affidavit, "Ditteo" and WOOD are used interchangeably to describe WOOD.

and over the telephone. CW-1 has made numerous drug purchases from and recordings from target subjects in other investigations, in addition to the ones from WOOD described below. CW-1 has a criminal history including arrests for counterfeit, larceny, uttering, resisting arrest, disorderly conduct, assault, controlled substance, breaking and entering, and murder[2]. The information that CW-1 provided has been corroborated by the video of the controlled drug purchases, the recovery of the controlled substances, and by the investigation generally. I consider the information provided by CW-1 to be reliable. CW-1 has received consideration in the form of financial assistance in connection with his/her cooperation.

10. Over the course of the investigation, CW-1 has conducted at least three controlled purchases of controlled substance evidence and conducted recorded meetings and phone calls with WOOD. These recorded meetings and calls have provided evidence of WOOD's operation of his drug trafficking.

11. On November 26, 2019, Special Agent Leah Ferrara administered a photographic array consisting of eight photographs to CW-1. The photographic array contained seven "fillers" that were obtained from the Commonwealth Fusion Center /Massachusetts Registry of Motor Vehicles and a photograph of WOOD. Special Agent Ferrara had no knowledge of the identity of the possible subject. Special Agent Ferrara read aloud instructions from a Photo Array Check List and presented the photographic array in sequential order to CW-1. CW-1 identified the subject in photograph 6 as "Ditteo" who sold CW-1 fentanyl. CW-1 initialed photograph 6. Photograph 6 was the photograph of WOOD.

---

[2] This was a 1993 out-of-state arrest that did not result in a conviction.

## **PROBABLE CAUSE**
## **NOVEMBER 26, 2019 CONTROLLED PURCHASE OF**
## **1.2 GRAMS OF FENTANYL FROM WOOD**

12. On November 26, 2019, CW-1 met with the investigative team at a prearranged meeting place. I searched CW-1 and found him/her to be free of contraband. CW-1 was provided audio/video recording devices, including a device that would transmit to surveillance units. CW-1 was provided with $100 in Official Agency Funds ("OAF"). CW-1 placed a recorded phone call to WOOD at (857) 344-2736. I recorded the call and observed CW-1 place the call. After the phone call was placed to WOOD, CW-1 sent a text message to WOOD at (857) 344-2736, asking for a clarification of the meet location. I photographed the text exchange between CW-1 and WOOD. WOOD's telephone number, (857) 344-2736, is stored in CW-1's phone as "Ditteo."

13. CW-1 traveled to the meeting location in Boston provided by WOOD under the observation of the surveillance team. I observed a red 2001 Volkswagen Passat bearing Massachusetts registration 4BE982 (the "red Passat"), which agents had on previous occasions observed WOOD operating, parked unoccupied in the vicinity of the meet location. WOOD had also been identified driving this vehicle on at least one other occasion by the Boston Police in October 2019.

14. After some time, via electronic surveillance the surveillance team overheard CW-1 say that he was about to meet with WOOD. Thereafter, surveillance units observed, via electronic surveillance, WOOD enter CW-1's vehicle and sit in the front passenger seat. WOOD was wearing a camouflage style sweatshirt with a grey and orange pattern. Via a transmitter, surveillance could hear CW-1 meeting with WOOD inside the vehicle. Thereafter, surveillance observed WOOD exit CW-1's vehicle and walk away from CW-1.

15. CW-1 was followed by surveillance back to a predetermined location. CW-1 produced two small "twists" of suspected narcotics, consistent in appearance with heroin. A twist is a common method of selling narcotics. The narcotics are put into the corner of a plastic sandwich bag, the bag is twisted and knotted, and the remainder of the bag is discarded. After agents retrieved the suspected heroin from CW-1, I again searched CW-1 and found him/her to be free of contraband.

16. CW-1 said that he/she was met by WOOD at the agreed upon location. CW-1 described WOOD as wearing a colorful camouflage sweatshirt. CW-1 texted WOOD when he/she parked CW-1's vehicle to let WOOD know he/she was ready to meet. WOOD provided CW-1 with the two twists, and CW-1 provided WOOD with the OAF. I have reviewed the recording of this controlled purchase and the video and audio quality are clear. I can clearly see WOOD pass two twists of narcotics to CW-1.

17. I reviewed the audio/video recording from this controlled purchase, and it shows WOOD seated in the front passenger seat of CW-1's car holding the suspected heroin.

18. The two twists were found to weigh 1.2 grams.

19. After an initial field test of the suspected heroin was inconclusive, TFO Patrick O'Brien conducted a "Solution Kit Scan" field test on one of the twists of the light brown powder substance contained in the "twists" using a TruNarc Raman Spectrometer. The light brown powder substance tested positive for the presumptive presence of Fentanyl Compound or Methamphetamine. The substances were sent to the Drug Enforcement Administration, North East Laboratory for additional testing.

## DECEMBER 3, 2019 CONTROLLED PURCHASE OF
## 7.6 GRAMS OF FENTANYL FROM WOOD

20. On December 3, 2019, CW-1 placed a consensually recorded call with WOOD at (857) 344-2736 to arrange to purchase of "two hundo" or $200 worth of fentanyl under the direction of the law enforcement investigative team. On the recorded call, WOOD directed CW-1 to meet him at a location that CW-1 and WOOD had met on a previous occasion to purchase/sell drugs.

21. CW-1 and his/her vehicle was searched by law enforcement for money and contraband with negative results. CW-1 was provided a transmitter, audio/video recording devices, and $500 in OAF.

22. CW-1 remained under surveillance of the investigative team until he/she arrived at the location as directed by WOOD. CW-1 was overheard, via electronic surveillance, place an outgoing call. While on the call, the CW-1 was directed to another location in the City of Boston to meet with WOOD. The investigative team moved to the new location in advance of CW-1.

23. Surveillance units in the new meet location observed the red Passat parked in the area. Law enforcement officers have observed WOOD operate this vehicle during previous controlled purchases.

24. Surveillance units traveling with CW-1 to the new meet location observed CW-1 stop his/her vehicle and overheard, via electronic surveillance, CW-1 place an outgoing call and state, "I'm here." A short time later the surveillance team overheard, via electronic surveillance, CW-1 answer an incoming call. The calling party asked where CW-1 was located. CW-1 directed the caller to his/her vehicle.

25. Approximately ten minutes later, surveillance units observed, via electronic surveillance, WOOD enter the passenger seat of CW-1's vehicle. WOOD was wearing a gray

Champion sweatshirt and a gold chain. WOOD appeared to direct CW-1 to drive. Surveillance observed, via electronic surveillance, WOOD to be using a cell phone, to possess a second cell phone, and to have money hanging out of his sweatshirt pocket.

26. Surveillance observed CW-1 and WOOD travel and "make the block" and return to the original location. To "make the block" is a common term used to describe a meaningless drive to allow drugs to be sold out of public view. The drive is short in duration and usually ends up back at the original starting point.

27. Surveillance overheard, via electronic surveillance, WOOD ask, "You got a skizzy in here?" I know, from training and experience, that WOOD's reference to "skizzy" meant a scale on which he could weigh drugs.

28. Surveillance overheard, via electronic surveillance, WOOD take a call and ask what the calling party wanted. WOOD then referenced a "one and one." I know, from training and experience, that a "one and one" is a common phrase used to describe a quantity of cocaine and crack cocaine, or a quantity of cocaine and heroin/fentanyl.

29. Surveillance units observed, via electronic surveillance, WOOD exit CW-1's vehicle. Shortly thereafter surveillance units observed, via electronic surveillance, WOOD open the front passenger door of CW-1's vehicle. WOOD placed an item(s) on the front passenger seat. CW-1 handed WOOD an amount of cash. WOOD then departed. CW-1 then drove CW-1's vehicle out of the area.

30. Surveillance units maintained surveillance of CW-1 to a pre-determined meeting location. CW-1 provided surveillance units the transmitter, the two audio/video recording devices, $100 in OAF, and eight (8) clear plastic bags, each containing a light brown powder

substance. CW-1 and CW-1's vehicle were searched for money and contraband with negative results.

31. CW-1 provided the following information: CW-1 arrived at a location where he/she had previously met WOOD for the purpose of buying drugs and called WOOD. WOOD instructed CW-1 to go to another street not far from the location CW-1 was at.

32. CW-1 drove to the new meet spot as directed by WOOD. CW-1 called WOOD to let WOOD know that s/he arrived. WOOD told CW-1 he would be there in a minute.

33. After a while, CW-1 observed WOOD walking towards CW-1's vehicle. WOOD entered CW-1's front passenger seat. WOOD instructed CW-1 to make the block and directed CW-1 where to drive. As CW-1 drove, WOOD took several calls. CW-1 believed the calls to be related to drug activity and heard WOOD reference a "one and one." This is a common drug order, usually meaning a quantity of cocaine and a quantity of heroin/fentanyl or a quantity of cocaine and a quantity of crack cocaine.

34. After parking, WOOD asked CW-1 what CW-1 wanted. CW-1 told WOOD, "four bags." WOOD handed CW-1 four clear plastic bags containing a light brown powder substance. CW-1 handed WOOD $200 in OAF.

35. CW-1 asked WOOD if s/he could buy four additional bags. WOOD told CW-1 he could give CW-1 a deal at $45/gram. WOOD asked CW-1 if CW-1 had a scale. WOOD then said he had a scale and would go weigh the drugs out. WOOD exited CW-1's vehicle. CW-1 could not see where WOOD walked.

36. Several minutes later, WOOD returned to the passenger side of CW-1's vehicle. WOOD opened the front passenger door and gave CW-1 four plastic bags of a light brown powder substance. CW-1 handed WOOD $200 in OAF. WOOD then walked away.

37.   CW-1 drove out of the area and directly to the pre-determined meeting location.

38.   SA Kenny reviewed the two audio/video recordings. The audio and video quality of each recording is clear. In each recording, SA Kenny can clearly see WOOD in the passenger seat of CW-1's vehicle.

39.   SA Kenny can further see WOOD pass four clear plastic bags to CW-1 and CW-1 hand cash to WOOD. Later in the recording, SA Kenny can clearly see WOOD place four plastic bags on the front passenger seat and CW-1 hand cash to WOOD.

40.   The suspected fentanyl weighed 7.6 grams. TFO Patrick O'Brien conducted a "Solution Kit Scan" field-test of the light brown powder substance using a TruNarc Raman Spectrometer. The light brown powder substance tested positive for the presumptive presence of Fentanyl Compound or Methamphetamine. The fentanyl has been sent to the Drug Enforcement Administration, North East Laboratory for additional testing.

## DECEMBER 10, 2019 CONTROLLED PURCHASE OF 4.7 GRAMS OF CRACK COCAINE FROM WOOD

41.   On December 10, 2019, CW-1 conducted another controlled purchase of narcotics from WOOD. The investigative team was able to set up surveillance on WOOD prior to the meeting with CW-1 by utilizing the "pings" on WOOD's phone.[3] The investigative team established surveillance in the area of Draper Street in Boston. Surveillance was able to observe the red Passat parked near the detached garage of 76 Draper Street.

42.   CW-1 called WOOD in the presence of the investigative team. This call was recorded. CW-1 ordered "two hundo of the hard and two hundo of the brown." WOOD directed

---

[3] On December 6, 2019, the Honorable US Magistrate Judge Judith G. Dein authorized the FBI to receive location information on the phone assigned number (857) 344-2736, used by WOOD to conduct drug transactions, 19-MJ-5348-JGD.

CW-1 to meet him at the same place as last time. Shortly after the call was made, surveillance units observed that the red Passat had left the area of Draper Street.

43. CW-1 and CW-1's vehicle were searched for money and contraband with negative results. CW-1 was provided a transmitter, two audio/video recording devices, and $600 in OAF. The recording devices were activated and CW-1 was directed to meet with WOOD and purchase crack cocaine and fentanyl.

44. Surveillance units observed the red Passat parked near 11 Wabeno Street in Boston.

45. CW-1 arrived at the arraigned meeting location and sent a text message to WOOD stating, "Yo im here." A short time later, surveillance units overheard via electronic surveillance, CW-1 place an outgoing call to WOOD. CW-1 told WOOD that s/he had arrived at the location.

46. Surveillance units observed two males enter a white Nissan Altima, bearing MA license plate CC42AM, parked in the area of 11 Wabeno Street. The Nissan Altima departed the area. Surveillance units watching CW-1 observed the Nissan Altima park in front of CW-1's vehicle. A male dressed in black exited the passenger side of the Nissan Altima and walked to CW-1's vehicle.

47. Surveillance units observed, via electronic surveillance, WOOD enter the front passenger seat of CW-1's vehicle. WOOD was wearing a black sweatshirt, black sweat pants with an orange Nike logo on the upper left leg, a backwards black hat, and a gold chain.

48. Surveillance units observed, via electronic surveillance, that WOOD held a plastic bag containing a white substance. Surveillance units overheard CW-1 ask for $400 of the white. WOOD appeared to be manipulating the contents of the plastic bag in his lap and removing a portion of the white substance. WOOD then passed the plastic bag containing the white substance to CW-1. CW-1 then passed cash to WOOD.

49. Surveillance units observed WOOD exit CW-1's vehicle and enter the passenger side of the Nissan Altima. The Nissan Altima then departed the area.

50. Part of the investigative team maintained surveillance of CW-1 until s/he arrived at a pre-determined meeting location. CW-1 arrived at the location and provided the SA Kenny with the transmitter, the two audio/video recording devices, $200 in OAF, and a clear plastic bag containing an off-white rock-like substance.

51. CW-1 and CW-1's vehicle were searched for money and contraband with negative results.

52. CW-1 provided the following information, CW-1 arrived at the location as directed by WOOD. CW-1 exchanged calls and text messages with WOOD. After a while, WOOD appeared and entered the front passenger seat of CW-1's vehicle. WOOD told CW-1 that he did not have any brown because he just had a rush of customers and sold it all. WOOD stated he could get more brown if CW-1 could wait 15 minutes. CW-1 told WOOD that CW-1 would just buy $400 of hard (crack cocaine). WOOD described the amount of crack cocaine he would sell for $400. CW-1 realized that WOOD sold the crack cocaine in $20 amounts.

53. WOOD held a plastic bag containing crack cocaine. WOOD removed some of the crack cocaine from the plastic bag and placed it into a plastic twist. WOOD then handed the plastic bag containing the crack cocaine to CW-1. CW-1 believed the plastic bag contained approximately four grams of crack cocaine. CW-1 handed $400 in OAF to WOOD. WOOD told CW-1 that he would deliver the drugs to CW-1 closer to where CW-1 lived in the future. WOOD exited CW-1's vehicle.

54. SA Kenny reviewed the two audio/video recordings depicting this transaction. The audio and video quality of each recording is clear. In each recording, SA Kenny can clearly see

WOOD in the passenger seat of CW-1's vehicle. It is also clear to see WOOD pass the clear plastic bag containing the off-white rock-like substance to CW-1 and CW-1 hand $400 in OAF to WOOD.

55. The rock-like substance and the clear plastic bag weighed 4.7 grams. A field-test of the off-white rock-like substance using a TruNarc Raman Spectrometer. The substance tested positive for the presumptive presence of cocaine base, or crack cocaine.

## CONCLUSION

56. Based on the foregoing, I submit that there is probable cause to believe that, on November 26, December 3, and December 10, 2019, in Boston, DAVID WOOD did distribute and possess with intent to distribute Schedule II controlled substances in violation of Title 21, United States Code, Section 841(a)(1).

_____
William R. McDermott
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 18th day of December, 2019.

_____
HONORABLE JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE